IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| UTAH REVERSE EXCHANGE, LLC, et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CIVIL ACTION  14-0408-WS-B ) |
| LINDA DONADO, et al., | ) ) ) |
| Defendants. | ) |

**ORDER**

As set forth in more detail in other Court orders, the plaintiffs are four limited liability companies ("Utah," "Range," "Water" and "Patmos"), and one corporation ("Florencia"), all formed by non-party Charles Breland to facilitate his business of buying, developing and reselling real estate.  The defendants are a mother and son ("Linda" and "William") who performed services for Breland and certain of his entities regarding various properties.  The plaintiffs seek a declaration that they owe nothing to the defendants arising out of their rendition of such services.  (Doc. 1 at 7; Doc. 88-1 at 2).

The defendants counterclaimed against all five plaintiffs, as well as against another LLC formed by Breland ("Osprey"), on theories of breach of contract and promissory estoppel.[1]  The defendants' claims address two properties:  the "Mexico property" and the "Utah property."  The claims concerning the Mexico property were tried to a jury in February 2016 and resulted in a verdict for the defendants on the promissory estoppel claim in the amount of $250,000 and a verdict for the plaintiffs on the contract claim.  (Doc. 113 at 5-6).

---

[1] As discussed in detail in a previous Court order, (Doc. 74), Breland filed for personal bankruptcy and received a discharge, which presumably explains the defendants' failure to pursue a counterclaim against him.

The defendants' claims regarding the Utah property were tried to the Court, with the Court considering evidence presented to the jury as well as additional evidence presented only to the Court. After the parties rested, the plaintiffs[2] moved for judgment as a matter of law. (Doc. 108).[3] The Court provided the parties an opportunity to submit post-trial briefs, and they did so. (Doc. 109, 112). The presentation of evidence and the submission of briefing having concluded, the matter is ripe for resolution.[4] After carefully considering the evidence, the written and oral argument of counsel, and the final pretrial order and incorporated joint pretrial document, (Docs. 88-1, 90), the Court issues these findings of fact and conclusions of law pursuant to Rule 52(a).[5]

---

[2] For convenience, and unless otherwise noted in a particular instance, the Court includes Osprey within the term "plaintiffs," even though it was not an original plaintiff but is instead only a counterclaim defendant.

[3] As the defendants point out, (Doc. 109 at 1 n.1), since the Utah portion of the case is being resolved by bench trial, the motion should have been denominated as one for judgment on partial findings pursuant to Rule 52(c) rather than as one for judgment as a matter of law pursuant to Rule 50(a). The Court, however, does not agree with the defendants that the misnomer requires denial of the motion on that ground. Instead, the Court will treat the motion as one for partial findings, as did the Eleventh Circuit in the case on which the defendants rely.

[4] Resolution has been delayed by Osprey's post-trial bankruptcy. (Doc. 114). The defendants received relief from the automatic stay on October 12, 2016. (Doc. 123-1). That relief having been obtained, the parallel stay imposed by the Court, (Doc. 115), is **lifted**.

[5] As the Court noted in its order establishing that the case as to the Mexico property would be tried to a jury and that the case as to the Utah property would be tried to the Court, (Doc. 97), "[w]hen legal and equitable claims are joined in the same action, the right to jury trial on the legal claim, including all issues common to both claims, remains intact." *Lytle v. Household Manufacturing, Inc.*, 494 U.S. 545, 550 (1990) (internal quotes omitted). The Court acknowledged it "will be bound on the Utah side by findings made by the jury on the Mexico side," to the extent the jury's findings are known. (Doc. 97 at 3 & n.4). The Court suggested that the parties propose special interrogatories for this purpose, (*id.*), but the parties declined to do so. Therefore, only such facts as are necessarily established by the jury's general verdict regarding the Mexico property can be binding on the Court as to the Utah property. *E.g., Brown v. Alabama Department of Transportation*, 597 F.3d 1160, 1184 (11th Cir. 2010).

# FINDINGS OF FACT AND CONCLUSIONS OF LAW[6]

As noted, the defendants bring two claims regarding the Utah property: breach of contract and promissory estoppel. The Court addresses the defendants' claims in sequence, followed by the plaintiffs' prayer for declaratory relief.

## I. Breach of Contract.

The defendants assert that Breland, on behalf of himself and the LLC plaintiffs, agreed to compensate them with a 25% mineral interest in the Utah property. The single measure of relief demanded by the defendants is specific performance, that is, transfer to them of a 25% mineral interest.

The parties agree that Utah law supplies the elements of the defendants' claim for breach of contract. (Doc. 88-1 at 8). They further agree that the elements of such a claim are: (1) a contract; (2) performance by the party seeking recovery; (3) breach by the other party; and (4) damages. (*Id.*).

### A. Elements.

The Court finds that the defendants and Breland originally agreed that they would be compensated for their work in connection with the Utah property by payment of 10% of the resale price of the property. The Court also finds that the defendants and Breland, on behalf of himself and the LLC plaintiffs, later agreed to compensate the defendants instead with a 25% mineral interest in the Utah property. The defendants testified that these agreements were entered orally, while Breland denied any such agreement. The Court finds the defendants more credible than Breland for several reasons, including without limitation the following circumstances.

First, Breland admits that he (through one of his entities) had an oral agreement with the defendants regarding their compensation with respect to the

---

[6] All findings of fact are by a preponderance of the evidence.

3

Mexico property, (Doc. 112 at 2), so an oral agreement with respect to the Utah property is consistent with the parties' previous dealings. Second, the 10%-of-resale-price measure of the original agreement regarding the Utah property is the same as with the Mexico property, and there was plentiful evidence that Breland and the defendants discussed and even laughed about the defendants' consistent 10% arrangement. Third, there was substantial evidence of Breland's tendency to abruptly alter business proposals to suit his purposes, with which practice his switch to a 25% mineral interest is consistent. Fourth, while the defendants' receipt of other forms of compensation for their efforts might suggest that such compensation was to the exclusion of a 25% mineral interest, the plaintiffs admit that the defendants have received from them no compensation of any sort in connection with the Utah property. (Doc. 88-1 at 8). Fifth, while Breland denied the specific compensation arrangement to which the defendants testified, he identified no different agreement governing the parties' relations; it is not plausible that the defendants purposely labored for free, so Breland's silence leaves the defendants' asserted compensation agreement as the only one supported by any evidence. Sixth, after observing the parties throughout the trial, the Court finds that Breland – in both his testimony and his demeanor – was less than ingenuous.[7] The Court finds that he was in all important respects a less credible witness than the defendants.[8]

---

[7] By way of example only, Breland testified that the first time he ever heard about a claimed 25% mineral interest was in this lawsuit. Adrian Zajac, however – who has no interest in this litigation and whom the Court finds to be credible despite the plaintiffs' ineffectual attempt to paint him as a dishonest businessman – testified that he discussed the 25% deal with Breland and the defendants in or before 2011. In fact, Breland initially testified that the first he had heard of a 25% agreement was during trial; his counsel then had to walk him back to admitting he had known of the alleged arrangement from the counterclaim.

[8] The Court has considered the plaintiffs' specific challenges to the defendants' credibility, (Doc. 112 at 7-9), and finds them to be overblown, largely inaccurate sideshows that do not appreciably undermine the defendants' credibility, certainly not compared to Breland's.

The Court finds that the agreement to compensate the defendants with a 25% mineral interest was entered on July 20, 21 or 22, 2005. William testified that Breland entered the agreement on behalf of himself and his LLCs, the first of which were formed on July 20, two days before closing.[9]

The Court finds that Breland entered the agreement to compensate the defendants with a 25% mineral interest on behalf of himself and on behalf of the LLC plaintiffs. It is uncontroverted that Breland is and always has been the sole member of these entities, and their close connection to both Breland and the Utah property satisfies the Court that Breland entered the agreement for them as well as for himself.

As addressed in Part I.B, the Court finds that the defendants fully performed their obligations under the July 2005 agreement. As discussed above, the LLC plaintiffs have breached the agreement because no mineral interest has been transferred to the defendants. And the defendants have been damaged by the failure to receive the agreed (or any) compensation for their efforts.

For the reasons set forth above, the Court finds that the defendants have established all elements of their claim for breach of contract against the LLC plaintiffs.

### B. Statute of Frauds.

The plaintiffs argue that the Utah statute of frauds bars the defendants' contract claim. They originally invoked four different statutes, (Doc. 64 at 19-20), but they have now confined their argument to Utah Code § 25-5-3. (Doc. 108 at

---

[9] William testified in deposition that the agreement was reached right before closing. (Doc. 71-5 at 87; Doc. 74 at 7). Because the parties (who presented this evidence to the Court on motion for summary judgment) inexplicably failed to present such testimony at trial, the Court does not rely on it, but the Court's finding based on the evidence that was introduced at trial is consistent with it.

18).[10]  The Court, noting the defendants' concession, (Doc. 71 at 14, 16), has previously ruled that this provision "definitely applies." (Doc. 74 at 6-7).[11]

The defendants invoke the "partial performance" exception to Utah's statute of frauds.  "Nothing in this chapter shall be construed to abridge the powers of courts to compel the specific performance of agreements in case of part performance thereof."  Utah Code § 25-5-8.  The plaintiffs agree that "the doctrine of part performance allows a court to enforce an oral agreement, if it has been partially performed."  (Doc. 108 at 16).

"It is clear … that a verbal agreement to transfer an interest in land can be taken out of the statute of frauds, and that one can be estopped from challenging the oral agreement if three requirements are met:  A court must find (1) that there was such an agreement, (2) that there had been part or full performance, and (3) that there was reliance thereon."  *Orton v. Carter*, 970 P.2d 1254, 1259 (Utah 1998).  The parties agree that these are the elements of the part performance exception.

Demonstrating these elements is not easy.  As to the first element, "the terms of the oral contract must be clear and definite and established by clear and definite testimony."  *Bradshaw v. McBride*, 649 P.2d 74, 79 (Utah 1982); *accord Spears v. Warr*, 44 P.3d 742, 751 (Utah 2002), *disavowed in part on other*

---

[10] "Every contract … for the sale, of any lands, or any interest in lands, shall be void unless the contract, or some note or memorandum thereof, is in writing subscribed by the party to whom the …  sale is to be made, or by his lawful agent thereunto authorized in writing." Utah Code § 25-5-3.

[11] The defendants, without explanation, now appear to question whether Section 25-5-3 applies.  (Doc. 109 at 5 ("Even if Utah's Statute of Frauds applies to this claim ….").  Any resistance on this ground comes too late to undo their previous concession, especially given their failure to identify any basis for concluding the statute does not apply.  *Cf. Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 629 (Utah 1989) ("An oil and gas royalty is an interest in land."); Utah Code § 57-1-1(3) (defining "real property" to include "any … interest in land, including all nonextracted minerals located in, on, or under the land ….").

*grounds*, *Tangren Family Trust v. Tangren*, 182 P.3d 326, 331 n.20 (Utah 2008).[12] As to the second element, "the acts done in performance of the contract must be equally clear and definite …." *Spears*, 44 P.3d at 79 (internal quotes omitted). And as to the third element, "[s]uch acts in reliance must be such that (a) they would not have been performed had the contract not existed, and (b) the failure to perform on the part of the promisor would result in fraud on the performer who relied, since damages would be inadequate." *Id*. (internal quotes omitted).[13] "The critical observation to make in reading these delineations of what constitutes sufficient part performance is that it must be proved by strong evidence." *Martin v. Scholl*, 678 P.2d 274, 275 (Utah 1983).

As noted above, the Court has found that an oral agreement to transfer to the defendants a 25% mineral interest in the Utah property existed. The defendants argue that the consideration for this promise consisted of their efforts in acquiring the Utah property as well as their post-acquisition efforts in exploring the mineral interests thereunder. They point to evidence that they engaged in such exploration activity as demonstrating that they performed and that they did so in reliance on the agreement.[14]

---

[12] According to the plaintiffs, the "clear and definite" standard can be met only by the resisting party's admission, a partial writing, or "the testimony of disinterested witnesses." (Doc. 108 at 17-18). The plaintiffs, however, identify no Utah authority for such a stringent rule. Instead, they rely on a law review article that did not purport to express existing law but merely offered a "suggested formulation for a modern part performance doctrine." (Doc. 109-1 at 17-18). In the 52 years since its publication, apparently no Utah court has adopted the article's suggestion, and the Court declines to be the first to do so.

[13] "The reason for such requirement [that acts of part performance "must be exclusively referable to the contract"] is that the equitable doctrine of part performance is based on estoppel and unless the acts of part performance are exclusively referable to the contract, there is nothing to show that the plaintiff relied on it or changed his [or her] position to his prejudice …." *Spears*, 44 P.3d at 751 (internal quotes omitted).

[14] The plaintiffs argued at trial that evidence of post-acquisition activity lies beyond the issues preserved for trial. This is incorrect, as the joint pretrial document

As found in Part I.A, the agreement to compensate the defendants with a 25% mineral interest was reached just before closing.  The defendants presented no evidence that they performed acquisition services after the agreement was reached, and the Court finds that they did not do so.  Thus, the part performance exception to the statute of frauds can be in play only if the consideration for the agreement to transfer the mineral interest included post-acquisition services in exploring the property's minerals.

According to the defendants, William testified that the agreement required them, as part of the consideration for receiving a 25% mineral interest, to participate with Breland in developing the Utah property's mineral resources.  (Doc. 109 at 2-3, 5-6, 7).  The Court cannot agree.  What William actually said was that "we were to have 25 percent of the minerals and mineral interest, the revenue interest in the property *as part of putting the deal together*."  (Doc. 111-1 at 71 (emphasis added)).  Putting the deal together is pre-acquisition activity, not post-acquisition exploration.

William also testified that, before presenting the Utah property to Breland, he had been working with Southern Companies ("Southern") "to put together an offer to come in and buy the property."  (Doc. 111-1 at 29-30).  He testified that his "agreement for compensation" with Southern was "[a] 25 percent interest in the minerals moving forward," plus a ten percent fee based on the purchase price.  (*Id*. at 30).  The Court finds that William reached an agreement with Southern to receive a 25% mineral interest exclusively for his acquisition efforts.  Because William testified that the defendants' deal with Breland was "basically the same deal that I had made with Southern Companies," (*id*. at 31), it is clear that the defendants' deal with Breland was to receive a mineral interest based solely on the defendants' acquisition efforts.

---

addresses in some detail the defendants' post-acquisition exploration efforts.  (Doc. 88-1 at 8-9).

The defendants, (Doc. 109 at 3, 5), stress that Larry Trice, a representative of Breland, wrote a letter in 2007 describing William as one "with whom we participate in our Utah gas and oil exploration." (Defendants' Exhibit 8 at 1). This statement, however, sheds no light on the terms of the agreement to transfer a 25% mineral interest; William would have had incentive to "participate" in mineral exploration even if he had already fully performed his obligations under the agreement, since he would be exploring a mineral interest he was already owed.[15]

As noted, to successfully invoke the part performance exception, the defendants are required to establish, by clear and definite testimony, that the terms of the oral contract clearly and definitely required them to perform post-acquisition work as consideration for receiving a 25% mineral interest. They have come nowhere close to meeting this demanding standard.[16] The Court finds that the agreement to compensate the defendants with a 25% mineral interest did not make post-acquisition efforts part of the consideration.

---

[15] The defendants argue that William's deposition, their brief in opposition to motion for summary judgment, and the joint pretrial document all reflect that post-acquisition work was part of the consideration. (Doc. 109 at 3-4 n.3). Briefs and other filings, of course, are not evidence, and no party submitted William's deposition as trial evidence. Even had the defendants done so, the Court has already noted that his deposition testimony indicates only an agreement to transfer a mineral interest "as compensation simply for their services in acquiring the Utah property." (Doc. 74 at 7). Even William's deposition assertion that he "earned every dime" of the mineral interest by his post-acquisition activity, (Doc. 71-5 at 116), is a rationalization for why he deserves the mineral interest, not testimony as to what the terms of the contract actually were.

[16] The defendants suggest they need prove the elements of the part performance exception only by a "fair preponderance" of the evidence. (Doc. 109 at 5 n.6). This language, however, addresses the standard of review on appeal, not the quality of evidence that must be presented to sustain the exception – as the very case cited by the defendants reflects. *Spears*, 44 P.3d at 751. At any rate, a fair preponderance of the evidence does not support the proposition that post-acquisition activity was consideration for the agreement to transfer a 25% mineral interest.

Because the defendants cannot establish the first element of the part performance exception, the Court need not consider whether they could satisfy the second and third elements.[17]  The defendants' breach of contract claim is barred by the statute of frauds.

### C.  Summary.

The Court finds that the defendants have established every element of their claim for breach of contract.  The Court finds that the plaintiffs have established every element of their affirmative defense of the statute of frauds.  The Court finds that the defendants have not established every element of any exception to the statute of frauds.  The defendants have not prevailed on their breach of contract claim and are not entitled to any relief under that claim.  The plaintiffs' motion for partial findings is **granted** as the breach of contract claim.

## II.  Promissory Estoppel.

The promissory estoppel claim is presented as an "alternative" to the contract claim.  (Doc. 109 at 2 n.2).  The defendants assert that Breland promised on behalf of himself and the plaintiff LLCs to transfer to the defendants a 25% mineral interest in the Utah property.

The parties agree that Alabama law supplies the elements of the defendants' claim for promissory estoppel.  (Doc. 88-1 at 9).  They further agree that the elements of such a claim are:  (1) a promise which; (2) the promisor should have reasonably expected to induce action or forbearance of a definite and substantial character; (3) the promise did in fact induce such action or forbearance by the promisee; and (4) injustice can be avoided only by enforcing the promise.  (*Id*.).

---

[17] However, the discussion in text regarding the Larry Trice letter suggests the defendants cannot establish – at all, much less by strong evidence – that their post-acquisition work would not have been performed unless their receipt of a 25% mineral interest contractually depended upon it.

**A. Elements.**

For reasons expressed in Part I.A, the Court finds that Breland promised the defendants, on behalf of himself and the plaintiff LLCs, to transfer to the defendants a 25% mineral interest in the Utah property based on their services in acquiring the property. The Court further finds that Breland at the same time promised, on behalf of himself and the plaintiff LLCs, to participate with the defendants in oil and gas exploration on the Utah property.[18] The Court further finds that Breland and the plaintiff LLCs should have reasonably expected these promises to induce the defendants to invest substantial time and treasure in exploring the minerals on the Utah property, since they had been promised both that they would own ¼ of them and that Breland and his entities would participate in the costs of developing them.

The Court finds that Breland's promise induced the defendants to take actions of a definite and substantial character. Without pretense of being exhaustive, those efforts included securing a petroleum engineer, identifying additional mineral leases, negotiating mineral leases, crafting a drilling deal, working on multiple wells, exploring financing needed to retain state leases, and testifying as an entity representative. For years, William traveled to Utah 20-30 times a year, staying as long as six weeks at a time, and he paid all his own expenses for almost all these trips.

Finally, the Court concludes that injustice can be avoided only by enforcing the promise to transfer a 25% mineral interest. The plaintiffs admit the defendants "have not received any compensation from Breland or his entities in connection with the Utah property." (Doc. 88-1 at 8). This is an extraordinary injustice. Breland extracted from the defendants all their services in acquiring the Utah property (beginning with their bringing the property to his attention in the first place), in exchange for a promise to pay them 10% of the resale price. Shortly

---

[18] Trice confirmed this arrangement in the letter discussed in Part I.B.

before closing, he swapped the cash compensation for a 25% mineral interest. Failing to enforce this promise would condone Breland's complete stiffing of the defendants for services that he himself valued in seven figures.[19] This injustice would only be magnified by his stiffing the defendants for all the time, effort and money they expended in developing the mineral interests, the benefits of which Breland now claims exclusively for himself and his entities.[20]

The plaintiffs offer no relevant response. Rather than addressing promissory estoppel with respect to the 2005 promise to transfer a 25% mineral interest, they focus exclusively on attempting to show that promissory estoppel does not apply to a separate (and redundant) promise by Breland, made in 2010, to use the assets of all his entities to satisfy all obligations to the defendants. (Doc. 108 at 13-16). The plaintiffs' confusion is not easy to understand, given that the

---

[19] The Utah property was purchased for $13 million, and the Court finds Breland did not expect to resell the property at a loss. Thus, the parties anticipated the defendants would receive at least $1.3 million on resale.

[20] Breland blames William for unsuccessful drilling efforts on the property, but by his own telling the fault lay with the petroleum engineer, and Breland offered no evidence that William knew or should have known the engineer would fail. Breland also blames William for a $3 million judgment against Breland that occurred because Breland sought and obtained a loan that he thereafter refused to accept, triggering a default and litigation. Breland blames William for bringing the lender to his attention (after William's exhaustive efforts to obtain other financing failed to produce an acceptable proposal), but it is clear that Breland brought the whole mess on himself by his repudiation of his own deal. The Court finds that William is not at fault, either for the well failures or for Breland's loan fiasco, and neither furnishes grounds for finding no injustice in the refusal of Breland and his entities to honor their promises. What Breland's testimony on these matters chiefly accomplishes is to illustrate what the Court finds to be his pattern of resistance to honoring his obligations and of making excuses for doing so.

Breland also suggests that injustice is lacking because Zajac and/or Levada paid William $450,000 after Levada's 2011 bid to purchase the Utah property fell through. By the plaintiffs' own admission, the payment was made for services rendered in connection with that transaction, (Doc. 108 at 14), not for the defendants' work for Breland in acquiring the property years earlier. It is therefore irrelevant to the injustice inquiry.

joint pretrial document expressly and in detail ties the promissory estoppel claim to Breland's 2005 promise to transfer a mineral interest.  (Doc. 88-1 at 8-9).  Even after the defendants explicitly set forth their theory in their post-trial brief, (Doc. 109 at 2-5), the plaintiffs in their subsequent post-trial brief completely ignored it and instead repeated – essentially *verbatim* – their earlier, misdirected argument regarding the 2010 agreement.  (Doc. 112 at 14-17).  They have thereby forfeited whatever argument (if any) they might have raised in opposition to the defendants' theory.

### B.  Broker's License.

With exceptions not relevant here, "an individual is required to be licensed as a principal broker … if the individual performs, offers to perform, or attempts to perform one act for valuable consideration of … buying … real estate for another person" or of "offering for another person to buy … real estate."  Utah Code § 61-2f-201(2).  "Unless a person is licensed under this chapter, it is unlawful for the person to … act in the capacity of a principal broker …."  *Id*. § 61-2f-201(1).  "An individual required to be licensed under this chapter who violates this chapter … is, upon conviction of a first violation, guilty of a class A misdemeanor."  *Id*. § 61-2f-405(1)(a).  "A person may not bring or maintain an action in any court of this state for the recovery of a commission, fee, or compensation for any act done or service rendered if the act or service is prohibited under this chapter."  *Id*. § 61-2f-409(1)(a).  The plaintiffs assert that Alabama law precludes the defendants from recovering under a theory of promissory estoppel because they lacked a Utah broker's license.  (Doc. 108 at 21-22; Doc. 112 at 14).[21]

---

[21] The defendants maintain the plaintiffs forfeited this defense by not preserving it in the joint pretrial document.  (Doc. 109 at 9 n.14).  They are mistaken.  The plaintiffs expressly stated as an affirmative defense that "the Donados lack the requisite professional licenses to be paid for engaging in the transactions involved in this case."  (Doc. 88-1 at 9-10).

The burden is on the plaintiffs to establish all elements of this affirmative defense.[22]  The first of these elements is that the defendants bought or offered to buy the Utah property for Breland and/or his entities or offered or attempted to do so.  The plaintiffs have identified no such evidence.  It is clear that the defendants performed services in connection with Breland's acquisition of the Utah property (including informing Breland of its availability, examining the property, performing due diligence, and talking to the property owner's chief creditor), but the plaintiffs point to no evidence that the defendants actually bought the Utah property on behalf of Breland[23] or that they made the property owner (or chief creditor) an actual offer to purchase on behalf of Breland.  The Court finds that the defendants did not engage in activity that would trigger the license requirement.[24]

Even had the plaintiffs demonstrated that the defendants were required to hold a license but did not possess one, they have not demonstrated that such a failure precludes the defendants' claim.  In identifying the consequences of such a failure, the plaintiffs eschew Utah law.  Instead, they rely exclusively on Alabama law, arguing that it prohibits the defendants' claim because their pursuit of a 25% mineral interest is based on an "illegal contract," enforcement of which is barred by public policy.  (Doc. 108 at 21-22).

The Court detects multiple deficiencies in the plaintiffs' cursory treatment of the issue.  First, the plaintiffs have not explained – despite the defendants'

---

[22] *E.g., Fibro Trust, Inc. v. Brahman Financial, Inc.*, 974 P.2d 288, 295 n.8 (Utah 1999).

[23] The purchase agreement was executed by Breland, not by either defendant. (Defendants' Exhibit 4).

[24] The plaintiffs apparently seek to switch the focus of the inquiry to the defendants' efforts in connection with resale of the Utah property.  (Doc. 108 at 21).  However, as the plaintiffs admit, (*id*. at 19-20), and as the Court has found, the 25% mineral interest was promised exclusively for the defendants' pre-acquisition efforts.  At any rate, the Court finds the defendants did not sell the Utah property for Breland and/or his entities and did not make an actual offer to sell the property.

14

objection, (Doc. 109 at 8) – why Alabama law would supply the rule of decision.[25] Second, they have oversimplified Alabama law concerning the enforcement of "illegal" contracts. According to the plaintiffs, Alabama law is rigid and unforgiving: once a contract is declared illegal, its enforcement is automatically prohibited. The law, however, appears to be more nuanced:

> As a general principle, a party may not enforce a void or illegal contract either at law or in equity. [citations omitted] [T]he principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reason on which the doctrine rests. [citations omitted] The true test to determine whether a contract is unenforceable because of public policy is whether the public interest is injuriously affected in such a substantial manner that private rights thereunder should yield to public interest.

*Beverly v. Chandler*, 564 So. 2d 922, 924 (Ala. 1990) (internal quotes omitted); *accord J.C. Bradford & Co., L.L.C. v. Vick*, 837 So. 2d 271, 175 (Ala. 2002). Because the Court finds the defendants were not required to have a broker's license, the Court need not consider further the difficulties with the plaintiffs' legal argument.

### C. Other Matters.

As noted in Part I.B, the defendants' contract claim is barred by the statute of frauds. The plaintiffs have explicitly limited their invocation of this defense to the contract claim. (Doc. 108 at 16; Doc. 112 at 17). Because the plaintiffs have preserved no argument that the promissory estoppel claim is barred by the statute of frauds, the Court does not consider or address this forfeited defense.

---

[25] Choice-of-law issues are notoriously tricky, and the plaintiffs cannot by their own inaction shift to the Court the burden that rests on them of developing and articulating a logical, legally supported rationale for applying Alabama law. While the parties agreed that Alabama law supplies the elements of the defendants' promissory estoppel claim, (Doc. 88-1 at 9), they reached no similar agreement regarding the law governing the plaintiffs' affirmative defense.

The plaintiffs argue that the defendants' claims are barred by res judicata. (Doc. 108 at 5-13). The argument is presented as an almost *verbatim* repetition of the plaintiffs' trial brief. (Doc. 92 at 10-18). The Court, addressing that trial brief, has previously ruled that "the plaintiffs' res judicata defense is legally insupportable." (Doc. 103 at 4). That ruling remains unchanged.

The joint pretrial document preserved an affirmative defense of laches. (Doc. 88-1 at 9-10). The plaintiffs, however, did not mention – much less address – such a defense in either their Rule 50 motion or their post-trial brief. They have thereby forfeited any argument they might (or might not) have regarding the timeliness of the defendants' claim. *Cf. Sapuppo v. Allstate Floridian Insurance Co.*, 739 F.3d 678, 681 (11th Cir. 2014) ("We have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority.").

The plaintiffs propose that any recovery on the defendants' promissory estoppel claim should be limited to a 3% mineral interest rather than the 25% demanded. (Doc. 112 at 3-4 n.3). The basic idea seems to be that, because the jury awarded the defendants $250,000 on their promissory estoppel claim regarding the Mexico property (or about 12% of the $1.9 million they were seeking), the plaintiffs' recovery regarding the Utah property should likewise be limited to about 12% of what they seek, which would be roughly a 3% mineral interest. As discussed in note 5, *supra*, only such facts as are necessarily established by the jury's general verdict regarding the Mexico property can be binding on the Court as to the Utah property. The plaintiffs identify nothing necessarily established by the jury's verdict – on the contrary, they concede the "uncertain nature of the binding effect of the jury's finding in favor of the Donados on their promissory estoppel claim on the Mexico side." (Doc. 112 at 3 n.3). Because the Mexico claim involved a promise, made in 2004, to pay money for work regarding the Mexico property, while the Utah claim involves a different promise, made at a different time, to provide different compensation for different

16

work, and with different acts of reliance supporting the two claims, it is impossible to conclude that the jury made any finding regarding the quantum of recovery that could be binding on the Utah claim. To the extent the plaintiffs suggest the Court follow the jury though not bound to do so, the Court declines.

### D.  Summary.

The Court finds that the defendants have established every element of their claim for promissory estoppel. The Court finds that the plaintiffs have not established every element of their affirmative defense regarding a broker's license. The Court rejects the plaintiffs' affirmative defense of res judicata on grounds previously stated. The plaintiffs have not presented or preserved any other defense to the promissory estoppel claim. The defendants have prevailed on their promissory estoppel claim and are entitled to a judgment awarding them a 25% mineral interest in the Utah property. The plaintiffs' motion for partial findings is **denied** as to the promissory estoppel claim.

## III.  Declaratory Relief.

The plaintiffs seek a declaration "that there are no commissions, fees or expenses owed by" them to the defendants. (Doc. 1 at 7). Given the jury's verdict as to the Mexico claims and the Court's ruling as to the Utah claims, the plaintiffs are not entitled to the relief they seek.

## IV.  Judgment.

The parties are **ordered** to confer as to the form and content of a final judgment to be entered in this action and to file their proposed final judgment on or before **November 18, 2016**.

DONE and ORDERED this 4th day of November, 2016.

s/ WILLIAM H. STEELE<br>CHIEF UNITED STATES DISTRICT JUDGE