# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| UTAH REVERSE EXCHANGE, LLC, et al., | ) ) ) |
| **Plaintiffs,** | ) ) |
| v. | ) CIVIL ACTION  14-0408-WS-B ) |
| LINDA DONADO, et al., | ) ) |
| **Defendants.** | ) ) |

## ORDER

This matter is before the Court on the Rule 59(e) motion of the plaintiffs[1] to alter or amend the judgment.  (Doc. 129).  The defendants have filed a response, (Doc. 130), and the motion is ripe for resolution.

Trial was bifurcated, with a jury deciding the claims regarding the Mexico property and the Court resolving the claims regarding the Utah property.  The plaintiffs sought a declaration that they owed the defendants nothing, while the defendants sought, under theories of breach of contract and promissory estoppel, specific performance of a promise to transfer to them a 25% mineral interest in the Utah property.  The Court found that the defendants established their claim for breach of contract but that recovery was barred because they failed to establish the partial-performance exception to the Utah statute of frauds.  The Court found that the defendants established their claim for promissory estoppel, that the plaintiffs preserved no statute-of-frauds defense as to that claim, and that they failed to establish as an affirmative defense that the defendants' recovery was barred for want of a broker's license.  (Doc. 126).

---

[1] The movants include Osprey, which is technically only a counterclaim defendant, but for ease of reference both the movants and the Court include Osprey in the term, "plaintiffs."

As the plaintiffs acknowledge, (Doc. 129 at 8-9), "[a] Rule 59(e) motion cannot be used to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment." *Arthur v. King*, 500 F.3d 1335, 1343 (11th Cir. 2007) (internal quotes omitted). "The only grounds for granting a Rule 59 motion are newly-discovered evidence or manifest errors of law or fact." *Id*. (internal quotes omitted). The trial court's ruling on such a motion is reviewable only for abuse of discretion. *Id*. As this Court has noted in a related context, "[m]otions to reconsider serve a valuable but limited function. They do not exist to permit losing parties to prop up arguments previously made or to inject new ones, nor to provide evidence or authority previously omitted. They do not, in short, serve to relieve a party of the consequences of its original, limited presentation." *Nelson v. Whirlpool Corp.*, 668 F. Supp. 2d 1368, 1379 (S.D. Ala. 2009) (internal quotes omitted).

The plaintiffs assert that, in ruling in favor of the defendants on the promissory estoppel claim regarding the Utah property, the Court committed manifest errors of law and/or fact. The Court's challenged rulings, however, properly addressed the arguments the plaintiffs actually asserted at and after trial, and their post-judgment effort to argue now what they failed to argue then is precisely what is barred under Rule 59(e).

### A. Promissory Estoppel Claim.

As noted, the Court found that the defendants established all elements of this claim: (1) a promise, (2) which the promisor should have reasonably expected to induce action or forbearance of a definite and substantial character, and (3) which did in fact produce such action or forbearance by the promise, resulting in (4) injustice that can be avoided only by enforcing the promise. (Doc. 126 at 10-12). The Court then pointed out that the plaintiffs, rather than addressing the 2005 promise on which this claim was based, focused exclusively on a separate, vastly different promise made in 2010, with the result that they "offer[ed] no relevant

response" to the defendants' showing. (*Id*. at 12-13). The 2005 promise, made by Breland on behalf of himself and all of the plaintiffs, was to transfer to the defendants the 25% mineral interest in exchange for their work in acquiring the Utah property. The 2010 promise, made by Breland on behalf of himself and all of his entities, was to use all their assets to satisfy all his obligations to the defendants (which included not only the 25% mineral interest but also money related to transactions other than the Utah property), in exchange for the defendants' work in Breland's bankruptcy proceedings and for their not filing a claim in those proceedings.[2]

The plaintiffs now insist that, by addressing the 2010 promise, "they were directing their arguments necessarily to the 2005 promise to transfer a 25% mineral interest to the Donados because that promise was a part of the obligations … that they claimed Breland owed them." (Doc. 129 at 11). The question, however, is not whether the two promises are completely unrelated but whether the arguments the plaintiffs made regarding the 2010 promise have any relevance to the 2005 promise. Patently, they do not.

The plaintiffs' only argument regarding the 2010 promise was that the defendants could not have relied to their detriment on that promise because: (1) they were paid by Adrian Zajac for their work in trying to sell the Utah property to his company out of the bankruptcy proceedings; and (2) they insist it was not necessary for them to file a claim in Breland's bankruptcy in order to pursue

---

[2] The Court did, and does, find the plaintiffs' misdirected focus on the 2010 promise inexplicable, given that the joint pretrial document explicitly tied the promissory estoppel claim to the 2005 promise, not the 2010 promise. (Doc. 88-1 at 8-9; Doc. 126 at 13). Even after the defendants' post-trial brief reminded the plaintiffs that "[t]he promise in question is not Breland's promise to pay the Donados from the assets left after his bankruptcy as plaintiffs contend, but Breland's promise that plaintiffs would transfer 25% of the Utah property's mineral rights to the Donados, then participate with the Donados in the development of the Utah property's minerals," (Doc. 109 at 2-3), the plaintiffs' subsequent post-trial brief again completely ignored the 2005 promise and offered only an essentially *verbatim* regurgitation of their motion for judgment on partial findings, limited to the 2010 promise.

3

claims against Breland's entities. (Doc. 108 at 13-16; Doc. 112 at 14-17). The defendants' detrimental reliance on the 2005 promise, as found by the Court, consisted of mineral exploration activity on the Utah property, most or all of which occurred before the 2010 promise was even made. (Doc. 126 at 11). The plaintiffs' arguments regarding detrimental reliance, which do not come within a country mile of addressing the defendants' reliance on the 2005 promise, are thus irrelevant.

The plaintiffs appear to argue that, even if their arguments as to the 2010 promise are irrelevant to the 2005 promise (as they obviously are), the defendants cannot prevail on their promissory estoppel claim without proving that they also detrimentally relied on the 2010 promise. (Doc. 129 at 11-12). Their theory is that the 2010 promise is the only promise by which Breland bound Osprey, the entity that now holds the 25% mineral interest. (Doc. 129 at 11-12). The Court, however, found that the 2005 promise was made on behalf of all the entity parties, including Osprey. (Doc. 126 at 2 n.2, 3-5, 11). The plaintiffs posit that Breland's 2005 promise was made only on behalf of "the four entities which had taken title … to the Utah property in 2005," (Doc. 129 at 11), but they identify no evidence that would even support, much less compel, such a restrictive finding. They note only that Osprey was formed in 2011, so perhaps they mean to suggest that Breland did not or could not bind Osprey before it was formed. Even if that is their point, they never raised it before judgment was entered,[3] and it is far too late to do so now. Nor, even now, do they endeavor to support such a position either factually or legally.

---

[3] The plaintiffs had endless opportunities to do so, including after the Court found for the defendants. The Court provided the parties two weeks to confer and to file a proposed final judgment. (Doc. 126 at 17). Rather than complain that Osprey could not be compelled to transfer the mineral interest, the plaintiffs agreed with the defendants to submit a proposed judgment (entered by the Court) entering judgment against Osprey and awarding the defendants the 25% mineral interest. (Doc. 127-1 at 2).

Moreover, the plaintiffs' arguments regarding the defendants' detrimental reliance on the 2010 promise are plainly meritless. Even if Zajac did pay the defendants for their efforts in connection with his company's bid to buy the Utah property, that is not the benefit Breland promised in return for the defendants' working on his bankruptcy and for not filing a claim therein, and it is both counterintuitive and legally unsupported for the plaintiffs to suggest that there is no injustice in stiffing the defendants simply because a third party provided some[4] compensation.[5]

The plaintiffs' other argument regarding detrimental reliance makes even less sense. They say the defendants suffered no detriment in refraining from filing a claim in Breland's bankruptcy because they could still pursue claims against his entities (none of which filed for bankruptcy).[6] As this lawsuit demonstrates, proceeding against the entities is fraught with peril that could have been avoided had the defendants insisted that Breland personally make good on his debts and used the power of the Bankruptcy Court to ensure that it happened.

---

[4] Zajac paid William $450,000. The plaintiffs offered no evidence that the value of a 25% mineral interest in the Utah property is or ever was that small. On the contrary, the evidence is that Breland purchased the Utah property for $13 million and that he swapped a 10% cash payment for a 25% mineral interest as compensation for the defendants. The evidence, then, is that the value of a 25% mineral interest approximated $1.3 million.

[5] Under the plaintiffs' argument (and ignoring the FLSA), there is no injustice in an employer refusing to pay his servers their promised wage, so long as customers tip the servers.

[6] The plaintiffs elsewhere argue that res judicata arising out of the bankruptcy proceedings precludes the defendants from pursuing Breland's non-bankrupt entities; the Court has rejected their position. (Doc. 103).

### B. Statute of Frauds.

As noted, the Court ruled that the statute of frauds barred the defendants from prevailing on their claim for breach of contract. (Doc. 126 at 5-9).[7] The plaintiffs argue the Court committed a manifest error by not rejecting the defendants' promissory estoppel claim on the same basis. They cite a number of cases for the proposition that, if a contract claim is barred by the statute of frauds, a promissory estoppel claim based on the same promise is also barred by the statute of frauds. (Doc. 129 at 12-15). That may or may not be a correct statement of the law, but invoking it now cannot furnish grounds to alter the judgment.

The plaintiffs, like all litigants, have at all times been the masters of the arguments they elect to assert. When it came to the statute of frauds, the plaintiffs could not possibly have been more explicit. In both their motion for judgment on partial findings and their post-trial brief, the plaintiffs included a section entitled, "The Donados' *Breach of Contract Claim* is Barred by the Utah Statute of Frauds." (Doc. 108 at 16; Doc. 112 at 17 (emphasis added)). Nowhere in either brief did the plaintiffs assert that the statute of frauds had any application to the claim for promissory estoppel. The only argument the plaintiffs raised in their section addressing promissory estoppel was the detrimental reliance argument discussed in Part A. (Doc. 108 at 13-16; Doc. 112 at 14-17). The Court in its order pointed out that the plaintiffs "have explicitly limited their invocation of this defense to the contract claim" and concluded that "the plaintiffs have preserved no argument that the promissory estoppel claim is barred by the statute of frauds." (Doc. 126 at 15).

The plaintiffs, (Doc. 129 at 12), say they did not waive the statute of frauds as a defense to the promissory estoppel claim because they included in the joint pretrial document a statement that "an oral promise that is void by operation of the

---

[7] For reasons set forth in its opinion, the Court rejects the defendants' argument that they satisfied the partial performance exception to the statute of frauds. (Doc. 130 at 3-5).

statute of frauds will not support an action against the promisor for promissory fraud." (Doc. 88-1 at 10). Assuming without deciding that "promissory fraud" should be read as "promissory estoppel,"[8] the quoted statement sufficed to preserve the defense for trial, thus enabling the plaintiffs to invoke it during or after trial if they so chose. But it did not compel the plaintiffs to do so, and it did not excuse the plaintiffs from doing so. Because the plaintiffs did not ask the Court to reject the promissory estoppel claim based on the statute of frauds, the defense was as lifeless as that of laches, which the plaintiffs similarly preserved in the joint pretrial document but ignored in their Rule 50 motion and post-trial brief. As the Court ruled with respect to laches, the plaintiffs "have thereby forfeited any argument they might (or might not) have regarding the timeliness of the plaintiffs' claim." (Doc. 126 at 16).[9] The same holds equally for the statute of frauds defense.

The plaintiffs find it "inconceivable" that the Court "would ignore established Alabama precedent prohibiting its entry of judgment on the Donados' promissory estoppel claim after finding their breach of contract claim barred by the statute of frauds." (Doc. 129 at 14-15). That is, they find it "inconceivable" that the Court would not unilaterally research Alabama law and from that research develop, articulate and rely on an affirmative defense that the plaintiffs themselves elected not to present (much less brief) as a basis for either a judgment on partial findings or a judgment following trial. There is no burden on the Court to act as counsel for the litigants, and it is frankly inconceivable that the plaintiffs could believe otherwise.

---

[8] The defendants brought no claim for promissory fraud.

[9] The Court noted that, in the Eleventh Circuit, "[w]e have long held that an appellant abandons a claim when he either makes only passing references to it or raises it in a perfunctory manner without supporting arguments and authority." *Sapuppo v. Allstate Floridian Insurance Co.*, 739 F.3d 678, 681 (11th Cir. 2014). (Doc. 126 at 16).

7

### C. Broker's License.

As noted, the Court ruled that the plaintiffs failed to establish as an affirmative defense that the defendants' recovery was barred for want of a Utah broker's license. (Doc. 126 at 13-15). The Court ruled that the defendants "did not engage in activity that would trigger the license requirement." (*Id*. at 14). The plaintiffs argue this ruling constitutes manifest error. (Doc. 129 at 15-26).

On motion for judgment on partial findings, the plaintiffs devoted two pages to this affirmative defense. (Doc. 108 at 21-22). All but three lines of this argument was directed to the proposition that, given the defendants' failure to obtain a broker's license, Alabama law would not permit any recovery. In their post-trial brief, the plaintiffs repeated their previous argument essentially *verbatim*, then added another two pages refuting the defendants' assertions that they were partners with Breland in developing the mineral resources of the Utah property. (Doc. 112 at 110-14).

The entirety of the plaintiffs' argument regarding the necessity of a broker's license reads as follows:

> With respect to the Donados' claim to be owed a commission on the 2011 re-sale of the Utah property in the form of a 25% mineral interest in the Utah property, Utah law requires a license. See Utah Code § 61-2f-201 (Appendix A attached).

(Doc. 108 at 21; Doc. 1112 at 10). In describing the consequences of a failure to obtain such a license (which they ascribed to Section 61-2f-405), the plaintiffs asserted that the defendants' "collection of any 'valuable consideration' as a real estate commission is prohibited by Utah law and punishable as a criminal act." (Doc. 108 at 22; Doc. 112 at 11). Although placed in quotes, the plaintiffs did not identify the source of their "valuable consideration" terminology.

Faced with this skeletal argument, the Court looked to Sections 61-2f-201 and 61-2f-405 – the only statutory provisions cited by the plaintiffs. The latter section does provide for criminal penalties for violation of the licensing chapter,

8

but it does not employ the phrase, "valuable consideration."  The former section does use that phrase, in subsection (2), which reads as follows:

> (2)   Except as provided in Section 61-2f-202, an individual is required to be licensed as a principal broker, associate broker, or a sales agent if the individual performs, offers to perform, or attempts to perform one act for valuable consideration of:
> >  (a)   buying, selling, leasing, managing, or exchanging real estate for another person; or
> >  (b)   offering for another person to buy, sell, lease, manage, or exchange real estate.

The Court construed this provision to require the defendants to obtain a broker's license only if they bought or offered to buy the Utah property for Breland and/or his entities or offered or attempted to do so.  The plaintiffs identified no such evidence, and the Court found that the defendants did none of the things listed in subsection (2).  Therefore, the Court concluded, the defendants were not required to obtain a broker's license.  (Doc. 126 at 14).

The plaintiffs express no disagreement with either the Court's findings of fact or its construction of Section 61-2f-201(2).  Instead, the plaintiffs argue that the Court should have analyzed their affirmative defense under different provisions:  Section 61-2f-201(1)(b) and Section 61-2f-102.  Belatedly realizing that three lines of opaque, unreasoned conclusion was suboptimal, they now inundate the Court with eleven pages of argument addressing their new-found argument. (Doc. 129 at 15-26). Under Section 61-2f-201(b), "[u]nless a person is licensed under this chapter, it is unlawful for the person to … act in the capacity of a principal broker …."  A "principal broker" is defined in Section 61-2f-102(18)(a)-(j) in terms of conduct.  According to the plaintiffs, a broker's license is required if the person acts in the capacity of a principal broker, and it was incumbent on the Court to explore Section 61-2f-102 to determine what conduct could constitute acting in the capacity of a principal broker.[10]  Had the Court done

---

[10] "In order to conduct a complete and thorough analysis of this issue, the Court should have examined the evidence showing what the Donados did to determine whether

9

so, the plaintiffs say, and had the Court researched and discovered the Utah and non-Utah cases they now cite for the first time, it would have realized that the defendants engaged in conduct satisfying four of the definitions of a principal broker. (Doc. 129 at 20-25).

The problem, again, is that the plaintiffs did not make this argument or even cite these provisions before judgment was entered.[11] Again, the plaintiffs insist it was the Court's job to devise, develop and support an argument the plaintiffs themselves never raised. In a word, no.

The plaintiffs suggest the Court took on this job because it quoted Section 61-2f-201(1). (Doc. 129 at 16). They fail to appreciate, however, why the Court quoted it. The Court quoted subsection (2) as identifying the circumstances triggering the requirement of a broker's license and then quoted subsection (1) as identifying the consequence of not obtaining such a license under the circumstances described in subsection (2) – *viz*., the unlawfulness of acting as a broker. Because the plaintiffs never argued or suggested that subsection (1) constituted a second, non-identical statement of circumstances requiring a license, requiring resort to Section 61-2f-201(18) to decipher, the Court did not so construe it, and its mere citation to subsection (1) imposed no duty on the Court to assume the plaintiffs' burden of articulating and supporting arguments.

---

any of their conduct fell within the definition of the Utah statutory term, 'principal broker.'" (Doc. 129 at 19).

[11] The plaintiffs did cite generally to Section 61-2f-201, but they did not cite specifically to any subsection. Because they invoked the quoted term, "valuable consideration" – a term that appears only in subsection (2) – the Court not merely reasonably but inevitably relied on that subsection as the only one raised by the plaintiffs.

The "Appendix A" submitted by the plaintiffs included multiple sections of Title 61, Chapter 2f, including Section 61-2f-102(18). (Doc. 108 at 25-31; Doc. 112 at 25-31). As noted in text, however, the plaintiffs never cited this section or asked the Court to review it.

Even had the plaintiffs timely articulated their new, post-judgment argument, it would have changed nothing.  The plaintiffs argue the defendants acted in the capacity of a principal broker under the "sells," "buys," "manages" and "negotiation" subsections of Section 61-2f-102(18).  (Doc. 129 at 20-23).[12]  None of these, however actually apply to the conduct for which the defendants seek the "valuable consideration" of a 25% mineral interest in the Utah property.

As the Court has found, the 25% mineral interest was promised "based solely on the defendants' acquisition efforts." (Doc. 126 at 8).  Selling real estate was not part of that acquisition.[13]  Buying is acquisition but, as the Court has found, the defendants did not buy the Utah property, Breland did.  (Doc. 126 at 14 & n.23).  As for negotiation, the plaintiffs admit the evidence is equivocal whether William did so, and they do not argue that Linda did so.  (Doc. 129 at 21).[14]  More importantly, this subsection is by its terms limited to negotiation "of a transaction listed in Subsections (18)(a) and (e),"[15] that is, negotiating the sale of real estate or managing property owned by another; if William negotiated anything, it was the purchase of the Utah property, not its sale.[16]  Finally, the management to which the

---

[12] The plaintiffs assign these provisions to different subsections than does the statute.  (Doc. 129 at 16-17 n.5).  The actual subsections are Section 61-2f-102(18)(a), (b), (e) and (g).

[13] The plaintiffs rely on Williams' testimony regarding "another deal" addressing the defendants' post-acquisition compensation.  (Doc. 129 at 20).  Even if such a deal existed, it is irrelevant to the plaintiffs' affirmative defense.

[14] Thus, Linda would be entitled to the 25% mineral interest even if William were disqualified for lack of a broker's license (which he is not, and which argument the plaintiffs have forfeited in any event).

[15] Utah Code § 61-2f-102(18)(g).

[16] Subsection (g)'s failure to mention subsection (b) (which addresses the buying of real estate) indicates that only negotiating for the seller is covered by subsection (g).  The Court has not researched this proposition, but – and this is the important point – neither have the plaintiffs, who bear the burden on this affirmative defense.  Once again, they cannot shift to the Court their burden of showing that the defense applies.

plaintiffs point is management of the Utah property after its acquisition. (Doc. 129 at 22). Again, the Court has already found that post-acquisition services were not part of the consideration for the 25% mineral interest, so any later management activity is irrelevant to the plaintiffs' affirmative defense.

## CONCLUSION

Choices made in litigation have consequences, and neither regret over those choices nor a desire to avoid their consequences furnishes grounds for relief under Rule 59(e). For the reasons set forth above, the plaintiffs' motion for such relief is **denied**.

DONE and ORDERED this 30th day of January, 2017.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE